Jacqueline A. Tommas
GRIFFITH, Appellant,

v.

FEDERAL LABOR RELATIONS
AUTHORITY.

No. 86–5720.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1987.
Decided March 25, 1988.

Elaine Kaplan, with whom Lois G. Williams, Washington, D.C., was on brief for appellant.

William E. Persina, Deputy Sol., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol., and Elsa D. Newman, Atty., Federal Labor Relations Authority, Washington, D.C., were on brief for appellee.

Before BUCKLEY and WILLIAMS, Circuit Judges, and OBERDORFER,* District Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

This case requires us to answer two important questions in the area of federal employment. First, we must decide the scope of Congress's preclusion of judicial review of decisions of the Federal Labor Relations Authority ("FLRA" or "Authority"). Second, because we conclude that Congress did not intend to cut off review of constitutional claims, we must decide whether federal civil service employees have a "property" interest, of the sort protected by the Due Process clause of the Fifth Amendment, in annual within-grade pay increases. We find that they do not.

## I. BACKGROUND

In June 1982 the Internal Revenue Service denied a within-grade pay increase to one of its employees, Jacqueline Tommas Griffith, on the grounds that she was not performing at "an acceptable level of competence." *See* 5 U.S.C. § 5335(a)(3)(B) (1982) (establishing that standard for such increases). Pursuant to 5 C.F.R. § 531.410 (1982), Griffith asked the agency to reconsider its decision. In preparing for this process, Griffith asked that her supervisor allow her to review documents relating to the denial. The supervisor refused to supply them, stating that they were either reports Griffith had prepared or reviews that she had previously received. The arbitrator later held, and the FLRA appeared to concede, that this withholding violated applicable regulations. *See* 5 C.F.R. § 531.410(a)(2); Joint Appendix ("J.A.") at 9; *NTEU v. IRS,* 17 FLRA 1058, 1059 (May 13, 1985). On reconsideration, the IRS again denied the increase. In so doing, it relied on several documents not provided to Griffith, again in violation of 5 C.F.R. § 531.410(a)(2).

Griffith next turned to arbitration under the grievance procedure established by the collective bargaining agreement between the National Treasury Employees Union and the IRS. Before the arbitrator, the union argued that the IRS had violated relevant procedural regulations in its reconsideration of the denial of Griffith's pay increase, and that these violations entitled her to a retroactive pay increase with back pay under the Back Pay Act, 5 U.S.C. § 5596 (1982). The arbitrator largely agreed and awarded Griffith the retroactive pay hike.

The IRS filed exceptions with the FLRA pursuant to 5 U.S.C. § 7122 (1982), and prevailed there. The FLRA held that the Back Pay Act authorized retroactive awards of within-grade increases only where there is a finding that "but for" the procedural violation the agency would have viewed the employee's performance as meeting the statutory standard. The Authority held the arbitrator's award to be contrary to the Back Pay Act because he had not made such a finding. Additionally, the Authority held that the "harmful error" standard of 5 U.S.C. § 7701(c) applied only to the appellate procedures of the Merit Systems Protection Board, and not to decisions by arbitrators.

The FLRA responded to these flaws in the arbitrator's decision not by remanding to him but by striking the retroactive within-grade increase. The union then moved for reconsideration of the decision on several grounds, specifically requesting remand to the arbitrator. The Authority denied the motion, asserting that the arguments presented by the union "constitute nothing more than disagreement with the merits of the Authority's decision." J.A. at 32.

Having exhausted her administrative remedies, the plaintiff turned to the district court. In June 1986 she brought a suit for declaratory and injunctive relief against the Authority, alleging that the FLRA had erred as a matter of law in its construction

* Of the United States District Court for the District of Columbia, sitting by designation pursu-

ant to 28 U.S.C. § 292(a).

of the Back Pay Act and, in the alternative, that the refusal of the Authority to remand her case to an arbitrator denied her due process. The district court granted the Authority's motion for summary judgment, holding that 5 U.S.C. § 7123(a) (1982) barred judicial review of non-constitutional claims, and that Griffith could not make out a colorable due process claim because she had no legitimate claim of entitlement to a within-grade pay increase. This appeal followed.

We first address the availability of judicial review for nonconstitutional claims. We find unusually clear congressional intent generally to foreclose review. Although we find that the statute leaves the door ajar for review of clear violations of statutory authority under *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), we conclude that none of the errors asserted here qualifies.

Turning to constitutional challenges, we find that under this court's decision in *Ralpho v. Bell*, 569 F.2d 607 (D.C.Cir.1977), Congress's language was not specific enough to foreclose review. However, finding no interest protected by the Due Process clause, we find no constitutional defect in the Authority's action.

## II. REVIEWABILITY OF NON-CONSTITUTIONAL CLAIMS

### A. *General preclusion of review*

The controlling statute is a provision of the Civil Service Reform Act of 1978 ("CSRA"),[1] 5 U.S.C. § 7123(a) (1982), which provides so far as is relevant:

Any person aggrieved by any final order of the Authority *other than an order under* —

1. Title VII of the CSRA is often referred to as the Federal Service Labor–Management Relations Statute ("FSLMRS"). To avoid the confusion that has permeated countless opinions and briefs, we will use the more general moniker "CSRA" throughout this opinion.

2. Section 7122 authorizes FLRA review of exceptions to arbitral awards. It reads, in pertinent part:

   (a) Either party to arbitration under this chapter may file with the Authority an exception to any arbitrator's award pursuant to the

*(1) section 7122 of this title (involving an award by an arbitrator), unless the order involves an unfair labor practice under section 7118 of this title ...,*

may ... institute an action for judicial review of the Authority's order in the United States court of appeals in the circuit in which the person resides or transacts business or in the United States Court of Appeals for the District of Columbia.

5 U.S.C. § 7123(a) (1982) (emphasis added).

Our construction of this language is informed by the general presumption favoring judicial review in the absence of "clear and convincing evidence of a contrary legislative intent," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1512, 18 L.Ed.2d 681 (1967) (internal quotes omitted). The Supreme Court has cautioned, however, that the clear and convincing evidence standard is neither a "talismanic test," *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 778, 105 S.Ct. 1620, 1627, 84 L.Ed.2d 674 (1985), nor an irrebuttable presumption, *Block v. Community Nutrition Institute*, 467 U.S. 340, 349, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984).

■ We are convinced that as a general matter Congress intended to preclude judicial review in the district courts of FLRA decisions concerning arbitral awards. § 7123 provides for circuit court review of FLRA final orders, but then explicitly excludes orders under § 7122 relating to FLRA decisions on arbitral awards.[2] From that exclusion Congress makes a discrete exception for orders involving unfair labor

arbitration.... If upon review the Authority finds that the award is deficient—
   (1) because it is contrary to any law, rule, or regulation; or
   (2) on other grounds similar to those applied by federal courts in private sector labor-management relations;
the Authority may take such action and make such recommendations concerning the award as it considers necessary, consistent with applicable laws, rules, or regulations.

5 U.S.C. § 7122(a).

practices. No one suggests that the exception is applicable here. Therefore, contrary to the appellant's contention, we need not resort to "negative inference" to find a preclusion of review in § 7123; although the statute authorizes certain types of review and fails to mention others, it specifically excludes review of the type of Authority decisions here at issue.

Thus it is hardly surprising that all circuit courts addressing the matter have concluded that § 7123 bars *circuit* court review of arbitral decisions not involving unfair labor practices. *Overseas Education Ass'n v. FLRA*, 824 F.2d 61, 63–69 (D.C. Cir.1987); *United States Dept. of Justice v. FLRA*, 792 F.2d 25, 28 (2d Cir.1986); *Tonetti v. FLRA*, 776 F.2d 929, 931 (11th Cir.1985); *AFGE, Local 1923 v. FLRA*, 675 F.2d 612, 613 (4th Cir.1982).

■ To be sure, Congress did not explicitly deny to *district* courts the power to review FLRA decisions. Nevertheless, where Congress has set out a complex scheme authorizing certain types of review but not others, the express preclusion of review of FLRA orders under § 7122 in the one mention of the subject powerfully suggests an intent to preclude review in every court. *See United States v. Fausto*, — U.S. ——, 108 S.Ct. 668, 673, 98 L.Ed.2d 830 (1988); *Block*, 467 U.S. at 346–47, 104 S.Ct. at 2454; *Switchmen's Union of North America v. National Mediation Board*, 320 U.S. 297, 305–06, 64 S.Ct. 95, 99, 88 L.Ed. 61 (1943). This is especially true in light of Congress's having explicitly given the district courts review authority in one area, namely temporary relief in unfair labor practice proceedings. *See* 5 U.S.C. § 7123(d).

Further, Congress specified that the FLRA was to review arbitrators' decisions on grounds "similar to those applied by Federal courts in private sector labor-management relations." 5 U.S.C. § 7122(a). Congress thus appears to have intended that in the area of arbitral awards the Authority would play in federal labor relations the role assigned to district courts in private sector labor law. The conference report on the Civil Service Reform Act confirms this view, stating that, "The Authority will only be authorized to review the award of the arbitrator on very narrow grounds similar to the scope of judicial review of an arbitrator's award in the public sector." H.R.Rep. No. 1717, 95th Cong., 2d Sess. 153 (1978), U.S.Code Cong. & Admin.News 1978, pp. 2723, 2887. To give district courts review of FLRA decisions would tend to redundancy and would imperil the features of the arbitral process that we believe Congress had in mind when it set up the scheme: finality, speed and economy.

The legislative history of the CSRA further supports our conclusion. The House version of the bill provided for review in federal courts of appeal of virtually all FLRA decisions, including those FLRA orders concerning arbitral awards. H.R. 11,280, 95th Cong., 2d Sess. § 701 (1978) (House version of § 7123 authorizing review at behest of "[a]ny person aggrieved by any final order of the Authority ... under section 7122 of this article (involving an award by an arbitrator)"). The Senate bill limited judicial review of the FLRA to unfair labor practice decisions, decisions involving constitutional issues, and decisions on exceptions to arbitrators' awards based on unfair labor practice complaints. S. 2640, 95th Cong., 2d Sess. § 701 (1978) (Senate's proposed § 7204(1) making all decisions of the Authority "final and conclusive" and stripping courts of jurisdiction to review, but allowing for review of "questions arising under the Constitution"). In conference, the House conferees acceded to the Senate view that FLRA decisions concerning arbitrator's awards would be reviewable only in cases involving unfair labor practices. The conference report made this intention crystal clear:

The Senate Bill made reviewable in court decisions of the Authority concerning unfair labor practices, including awards of arbitrators relating to unfair labor practices. Otherwise, the Senate provides that all decisions of the Authority are final and conclusive, and not subject to further judicial review except for questions arising under the Constitution.

.  .  .  .  .

In the House bill, unfair labor practice decisions are appealable as in the Senate. In addition, all other final decisions of the Authority involving an award by an arbitrator, and the appropriateness of the unit an organization seeks to represent are also appealable to the courts ...

.    .    .    .    . .

[*T*]*here will be no judicial review of the Authority's action on those arbitrators' awards in grievance cases which are appealable to the Authority.* The Authority will only be authorized to review the award of the arbitrator on very narrow grounds similar to the scope of judicial review of an arbitrator's award in the private sector. *In light of the limited nature of the Authority's review, the conferees determined it would be inappropriate for there to be subsequent review by the court of appeals in such matters.*

H.R.Rep. No. 1717, 95th Cong., 2d Sess. 153 (1978), U.S.Code Cong. & Admin.News 1978, p. 2887. (emphasis added). Thus, the conferees were faced with two very different schemes of judicial review of FLRA decisions, but consciously and explicitly chose the one cutting off review of decisions of the sort at issue in the instant case.

Our reading of the Act comports also with what we believe to have been a major object of the legislation: extending the benefits of arbitration in labor relations from the private to the public sector. In *The Steelworkers Trilogy,* the Supreme Court exalted the role of the arbitrator in labor-management disputes and set out a general policy of judicial deference to the decisions of arbitrators. *United Steelworkers v. American Manufacturing,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). *See also Devine v. White,* 697 F.2d 421, 435 (D.C.Cir.1983) (extolling virtues of arbitration). Moreover, the policies underlying judicial deference to arbitral decisions are as important for public as for private employment. *United States Department of Justice,* 792 F.2d at 29; *United States Marshals Service v. FLRA,* 708 F.2d 1417, 1420 (9th Cir.1983); *Carter v. Kurzejeski,* 706 F.2d 835 (8th Cir.1983); *Devine,* 697 F.2d at 439–40. A general power of review in the federal district courts would obviously undermine the speed, thrift and informality that Congress sought in establishing the arbitration/FLRA scheme.

In sum, the specific language of § 7123, the structure of the CSRA arbitration and review provisions, and the relevant legislative history all provide clear and convincing evidence that Congress intended to cut off judicial review of FLRA decisions regarding arbitral awards of the sort involved in this case. Congress could hardly have made its view on the matter clearer.

B.  *The* Leedom v. Kyne *Exception.*

■ Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction. *See generally* L. Jaffe, *Judicial Control of Administrative Action* 327–36 (1965). The leading case is *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), in which the Court found district court review proper, despite an express finality provision, where the National Labor Relations Board had acted "in excess of its delegated powers and contrary to a specific prohibition in the [National Labor Relations] Act." *Id.* at 188, 79 S.Ct. at 184. The Board had issued an order certifying a bargaining unit that included both professional and non-professional employees without polling the members, despite a provision in the Act providing that "the Board shall not (1) decide that any unit is appropriate for such purposes ... unless a majority of such professional employees vote for inclusion in such unit." *Id.* at 185, 79 S.Ct. at 182. The Court characterized the NLRB's order as "an attempted exercise of power that had been specifically withheld." *Id.* at 189, 79 S.Ct. at 184.

The *Leedom v. Kyne* exception is intended to be of extremely limited scope. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 480–81, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964); *Council of Prison Locals v. Brewer*, 735 F.2d 1497, 1501 (D.C.Cir.1984); *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1311–12 (D.C.Cir.1984); *Physicians National House Staff Association v. Fanning*, 642 F.2d 492, 496 (D.C.Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); R. Gorman, *Basic Text on Labor Law* 61–62 (1976). The Supreme Court and others have sought to confine it to agency error so extreme that one may view it as jurisdictional or nearly so. In *Kyne* itself, the Court noted that the suit was "not one to 'review', in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers." *Kyne*, 358 U.S. at 188, 79 S.Ct. at 184. Similarly, in *Oestereich v. Selective Service System Local Board No. 11*, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968), the Court followed *Kyne* to permit review of a final decision of a Selective Service Board that, solely in order to punish a registrant, had refused to give him a draft exemption for which he met all the statutory prerequisites. Without judicial intervention, the Court said, the Boards could deteriorate into "freewheeling agencies meting out their brand of justice in a vindictive manner." *Id.* at 237, 89 S.Ct. at 416. *See also United Food and Commercial Workers, Local 400 v. NLRB*, 694 F.2d 276, 279 (D.C.Cir.1982) (district court held to be without jurisdiction to review claim that an NLRB agent had violated a long-standing NLRB rule, as the rule did "not appear specifically in the National Labor Relations Act"); *Physicians National House Staff v. Fanning*, 642 F.2d 492, 496 (D.C.Cir.1980) ("an error of fact or law is insufficient; the Board must have acted without statutory authority"); *Local 130, IUERMW v. McCulloch*, 345 F.2d 90, 95 (D.C.Cir.1965) ("For [*Kyne*] jurisdiction to exist, the Board must have stepped so plainly beyond the bounds of the Act, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court").

In *Kyne* itself the Court stressed that the Board had acted "contrary to a specific prohibition in the Act" that was "clear and mandatory." 358 U.S. at 188, 79 S.Ct. at 184. We have said that review may be had only when the agency's error is "patently a misconstruction of the Act," *Hartz Mountain*, 727 F.2d at 1311 (quoting 2 *The Developing Labor Law* 1716 (C. Morris ed., 2d ed. 1983)), or when the agency has "disregarded a specific and unambiguous statutory directive," *United Food and Commercial Workers*, 694 F.2d at 278, or when the agency has "violated some specific command" of a statute, *Physicians National House Staff*, 642 F.2d at 496. *See also Council of Prison Locals*, 735 F.2d at 1501; *McCulloch v. Libbey–Owens–Ford Glass Co.*, 403 F.2d 916, 917 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969); Gorman, *supra*, at 64. Garden-variety errors of law or fact are not enough.

■ The error asserted by Griffith—if error it be—is plainly not judicially correctable under *Leedom v. Kyne*. At stake in the FLRA proceeding was the proper test to be applied where review uncovers a procedural error in the personnel decision under review. The statute in question, the Back Pay Act, 5 U.S.C. § 5596(b)(1), does not address the matter expressly. It merely provides, in relevant part, that

An employee who ... is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, *to have been affected* by an unjustified or unwarranted personnel action *which has resulted* in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee—

(a) is entitled ... to receive ...

(i) an amount equal to ... the pay ... which the employee *normally would have earned or received during the period if the personnel action had not occurred....*

5 U.S.C. § 5596(b)(1) (emphasis added).

The FLRA applied a so-called "but for" test, to wit, that the complaining employee

can secure back pay under the Act only if she can show that "but for the unwarranted violation [the procedural error], [she] would have received the within-grade increase." *NTEU v. IRS,* 17 FLRA at 1059. Griffith claims that this construction is "clearly wrong and ... egregiously out of step with settled law under the Back Pay Act." Appellant's Brief at 20.

It is readily apparent that the alleged error in the Authority's "but for" test differs both in kind and in severity from the essentially jurisdictional error asserted in *Kyne.* Though not the only possible construction of the statutory language, it is surely a colorable one. Indeed, in *Professional Airways Systems v. FLRA,* 809 F.2d 855 (D.C.Cir.1987), we noted that the "FLRA's 'but for' formulation appropriately effects the causal nexus mandated by the statute itself." *Id.* at 858. Thus, even assuming that the *Leedom* exception can be triggered by an error in interpreting a statute other than the agency's organic act, the FLRA's interpretation is not the sort of plain error the doctrine requires.

Griffith also suggests that because 5 U.S.C. § 7122 provides that the Authority may only act in a manner "consistent with applicable laws," the FLRA's allegedly erroneous construction of the Back Pay Act placed it beyond the pale of its statutory authority. This, of course, seeks effectively to incorporate the Back Pay Act into the FLRA's organic statute. Whatever support this might have in some circumstances, it has none where the legal error, if any, is at most one of failing to capture some marginal nuance of the Back Pay Act. Accepting such a claim would turn *every* error of law into a basis for review, effectively repealing hundreds of finality provisions. We do not believe that Congress desired such a result. Accordingly, the district court correctly concluded that it was without jurisdiction to review the appellant's non-constitutional claims.

### III. CONSTITUTIONAL CLAIMS

#### A. *Reviewability*

■ Griffith asserts that the Authority's disposition of her claim, particularly its failure to remand to the arbitrator, deprived her of "property," namely her interest in an annual within-grade pay increase, without due process, in violation of the Fifth Amendment. Under circuit law, neither Congress's language nor the legislative history of the CSRA is sufficient to preclude review of this claim.

The maxim that congressional preclusion of judicial review must be "clear and convincing" applies "in a particularly rigorous fashion," we have said, when constitutional claims are at stake. *Bartlett v. Bowen,* 816 F.2d 695, 699 (D.C.Cir.1987). Thus *Bartlett* itself considered a statute providing for review of a specified class of cases, unless "the amount in controversy is less than $1,000." *Id.* at 698 n. 5. We found that this allowed jurisdiction of a claim seemingly within the exception (it was for only $286), because plaintiff challenged the statute on constitutional grounds. *See also Johnson v. Robison,* 415 U.S. 361, 373–74, 94 S.Ct. 1160, 1168–69, 39 L.Ed.2d 389 (1974).

Even though constitutional attacks on a *statute* carry much less risk of trammelling the administrative system than do claims that a particular act of an agency was unconstitutional, we have extended this "particularly rigorous" style of interpretation into the latter, more treacherous area. In *Ralpho v. Bell,* 569 F.2d 607 (D.C.Cir.1977), plaintiff sought review of a decision of the Micronesian Claims Commission that, he alleged, deprived him of property without due process. The Commission pointed to Congress's provision that the Commission's dispositions should be "final and conclusive for all purposes, notwithstanding any other provision of law to the contrary and not subject to review." *Id.* at 613. Yet, finding in the legislative history no affirmative statement addressed to preclusion of *constitutional* claims, we held there was no preclusion of such claims. *Id.* at 620. *See also Ungar v. Smith,* 667 F.2d 188, 193 (D.C.Cir.1981) (also declining to find preclusion of constitutional attacks on an administrative decision).

One might attempt to distinguish *Ralpho* and *Ungar* on the ground that both involve

allegations that the agency's conduct had the effect of "taking" classical property rights. But nothing in the opinions' language suggests an intent to limit their strong version of the "clear and convincing" test to such rights. Accordingly, we think it would be disingenuous to suggest that our "particularly rigorous" application of the "clear and convincing" standard is subject to such a limitation.

Here of course the statute itself does not specifically preclude review of constitutional claims. The only reference in the legislative history is a provision in the original Senate bill, explicitly providing for review of FLRA decisions involving questions arising under the Constitution. S. 2640, 95th Cong., 2d Sess. § 701 (1978) (Senate bill's § 7204(1) making decisions of the Authority "final and conclusive" with exception for "questions arising under the Constitution"). The conference committee dropped the provision without explanation, in the course of generally moving to the Senate's far more restrictive approach to judicial review. *See* H.R.Rep. 1717, 95th Cong., 2d Sess 153 (1978). This silent deletion is not enough, under our cases, to support an inference of intent to preclude constitutional claims. *See Ungar,* 667 F.2d at 195 n. 2.

We therefore turn to the merits of plaintiff's constitutional claim.

## B. *Merits: The Procedural Due Process Claim*

■ In establishing a violation of her rights under the Due Process clause of the Fifth Amendment, plaintiff's initial hurdle is to establish that her interest in a within-grade pay increase was one protected by that clause. There being no suggestion that life or a liberty interest is involved, plaintiff can prevail only if that interest qualifies as "property." There being no property interest in the historical sense of the term, she must show that the substantive provisions governing the grant of such increases give her a "legitimate claim of entitlement." *Board of Regents of State*

*Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972). If they did so, it would be by specifying "particularized standards or criteria [to] guide the ... decisionmakers." *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (quoting *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2466, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring)). We believe that the district court was correct in concluding that she cannot make this threshold showing.[3]

At the outset we reject plaintiff's suggestion that the congressional and agency provision of grievance and arbitration *procedures* afford her a constitutional right, as she puts it, to use "established adjudicatory procedures to redress violations of law." She rests the suggestion on a reference in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), to Logan's "right to use the [Illinois Fair Employment Practices Act's] adjudicatory procedures," *id.* at 429, 431, 102 S.Ct. at 1154, 1155. It seems clear, however, that the property interest found and protected in *Logan* arose out of Illinois's creation of a substantive cause of action, not out of its procedural specifications. First, in identifying a property interest, the Court argued that the question was "affirmatively settled by the *Mullane* case [*Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)] itself, where the Court held that a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." 455 U.S. at 428, 102 S.Ct. at 1154. Second, the Supreme Court has now made it quite clear that legislative provision of procedural safeguards cannot in itself create a property interest for purposes of due process analysis. *See Olim v. Wakinekona,* 461 U.S. at 250–51, 103 S.Ct. at 1748; *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). *See also United States v. Caceres,* 440 U.S.

---

**3.** Plaintiff makes no claim that agency conduct has, independently of the statute and regulations, created "mutually explicit understandings" that would form an entitlement, *see Perry,* 408 U.S. at 601, 92 S.Ct. at 2699, so we have no occasion to assess that conduct.

741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (agency's breach of its own regulations is not *ipso facto* a violation of due process).

Accordingly, we turn to the substantive standards of the statute and regulations, to see whether they afford the necessary "particularized standards or criteria [to] guide the ... decisionmakers." *See Olim v. Wakinekona,* 461 U.S. at 249, 103 S.Ct. at 1747. This inquiry has two aspects: first a search for congressional intent on the degree of discretion left to the administrator, then a consideration whether, given the scope of discretion, the employee's interest should be classified as an entitlement.

The controlling statutory language derives from the Federal Salary Reform Act of 1962, Pub.L. No. 87–793, 76 Stat. 832 (codified as amended in scattered sections of 5 U.S.C.) (1962). It replaces a system under which within-grade pay increases were tied to performance ratings of "satisfactory" or better, and provides that federal employees are advanced to the next highest rate of pay within a particular grade only if "the work of the employee ... is of an acceptable level of competence *as determined by the head of the agency.*" 5 U.S.C. § 5335(a)(3)(B) (emphasis added).

The language conjures up a broad grant of discretion to the employee's superiors.[4] The generality and subjectivity of the term "acceptable" indicates that Congress favored flexibility and discretion over rigid standards; its explicit vesting of the decision in the agency head further suggests that the measure of "acceptable" competence need not be an objective one.

The courts most expert in this field, examining the statute for purposes of ascertaining the scope of judicial review, have found it to grant the agencies relatively free rein. In *Creamer v. United States,* 174 Ct.Cl. 408 (1966), the court emphasized that the statutory scheme made within-grade increases a matter of the agency head's discretion:

> We start ... with the premise that the employing agency had considerable leeway in deciding whether an employee had reached and maintained "an acceptable level of competence." This is indicated, first of all, by the words Congress used—"acceptable" necessarily implies discretion and choice; a judgment of "competence" plainly invokes evaluation, appraisal, and assessment; "as determined by the head of the [agency]" shows that no mechanical or automatic standard was being imposed by this statute, as had been the case under the prior law when a performance rating of "Satisfactory" was all-sufficient.

*Id.* at 416.

The court in *Creamer* went on to review the legislative history of the 1962 Act, finding most relevant an observation that Congress's purpose throughout was to construct a pay system providing for "executive discretion to meet individual and special needs, to use pay for motivating employees, and to initiate general adjustments as required." *Id.* (quoting Committee on Post Office and Civil Service, House of Representatives, *Statement of Purpose and Justification and Section-by-Section Analysis of the Legislation Requested by the President of the United States to Reform the Major Federal Statutory Salary Systems* 1 (Committee Print 1962)).

Other parts of the legislative history also support *Creamer's* view. The Senate Report noted that "rigid statutory rules of pay administration [had] deprive[d] the [statutory pay] systems of the adaptability so essential in a period of rapidly changing conditions," S.Rep. 2120, 87th Cong., 2d Sess. 4 (1962), and emphasized the need for "executive discretion to meet individual and special needs [and] to use pay for motivating employees ...," *id.* at 3.

---

4. The discretion is not, however, so broad as to preclude judicial review of the merits of the IRS's decision, which would have been available to Griffith if the arrangements between her union and the IRS had not supplanted her right of appeal to the Merit Systems Protection Board and thence to the Court of Appeals for the Federal Circuit. *See Espenshied v. Merits Systems Protection Board,* 804 F.2d 1233 (Fed.Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987); 5 U.S.C. § 7703(b)(1); 28 U.S.C. § 1295(a)(9).

Finding "a large grant of discretion" to the agency head, 174 Ct.Cl. at 417, the court concluded that the agency decision was reviewable only for abuse of discretion, and noted that the court "should not be quick to find an abuse," *id. See also Holder v. Department of the Army,* 670 F.2d 1007, 1010–11, 229 Ct.Cl. 417 (1982).

The Court of Appeals for the Federal Circuit, the successor to the Court of Claims, S.Rep. 275, 97th Cong., 2d Sess. 3 (1982), U.S.Code Cong. & Admin.News 1982, p. 11, followed *Creamer* in analyzing the relation between agency discretion and the scope of judicial review of decisions under § 5335. In *Carroll v. Department of Health and Human Services,* 703 F.2d 1388 (Fed.Cir.1983), the court said that "Congress intended to grant the agencies a wide degree of discretion in approving or denying such increases," *id.* at 1390, and that the judicial function was exhausted when the court found "a rational basis for the conclusions of the administrative body," *id.*

The Senate Report also supported the proposed amendments with the argument that "the salary system must provide equity among Federal employees and between Federal employees and those in private employment." S.Rep. 2120, 87th Cong., 2d Sess. 3 (1962). We do not take the reference to "equity" to undercut the stress on flexibility or in any way to endorse automatic, or semi-automatic, lockstep advances. Quite the opposite: the accompanying comparisons to private employment suggest that equity is to be secured by a broad discretion rather than by bureaucratic rigidity.

■ Civil service or IRS regulations might generate an entitlement where the statute had not, *Kizas v. Webster,* 707 F.2d 524, 539 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984), if consistent with the statute, *Car-*

*ducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir. 1983). Those in force when appellant was denied her increase in 1982, however, plainly did not further constrain the agency head's discretion.[5] 5 C.F.R. § 531.409(a) (1982), like the statute, simply gave to the head of the agency or his delegate the responsibility for determining whether an employee is performing at an acceptable level of competence. 5 C.F.R. § 531.403 (1982) defined that level simply as "a level of performance *identified by an employing agency* at which the performance by an employee of the duties and responsibilities of his or her assigned position is fully acceptable (or equivalent terms such as fully satisfactory or fully successful used in the agency's performance appraisal plan) ... and warrants advancement of the employee's rate of basic pay to the next higher step of the grade of his or her position." (emphasis added). The emphasized language essentially consigns the problem of criteria to the employing agency, and the "warrants advancement" language, far from establishing any kind of test, simply restates the purpose for which the evaluation is to be made. In sum, therefore, neither the statute nor the applicable regulations seem to us significantly to constrain the agency head's discretion to decide whether employees are performing at an acceptable level of competence. Although the decision may not be based on illegitimate factors and cannot be arbitrary or capricious, it can rest on judgment about intangibles as much as on objectively verifiable facts.

■ We must now decide whether such a standard—or lack of one—generates a property interest or entitlement. The cases do not delineate a line of crystalline purity, but we find several elements militating against a finding of a property interest: (1) the vagueness of the controlling term ("acceptable"), (2) Congress's specific

---

**5.** The instant case concerns only those regulations. The current ones, which went into effect in March 1986, tie the determination of acceptable performance for within-grade increases into the existing agency performance appraisal systems, and thus may place somewhat greater constraints on the agency head's discretion. 5

C.F.R. §§ 531.401–531.413 (1987). *See AFGE v. Office of Personnel Management,* 618 F.Supp. 1254, 1262–63 (D.D.C.1985) (comparison of old and new regulations), *aff'd mem.,* 782 F.2d 278 (1986). Our decision of course applies only to the old regulations.

vesting of the decisionmaking authority in the agency head, (3) the decision's similarity to a promotion, and (4) Congress's manifest interest in flexibility.

*Vagueness of standard.* Obviously the term "acceptable," standing alone, hardly amounts to "particularized standards or criteria." In the context of *dismissal* of non-probationary employees, however, we have found some rather vague standards to be consistent with an entitlement. For instance, in *Johnson v. United States,* 628 F.2d 187 (D.C.Cir.1980), we found that an employee who could be dismissed only for "such cause as will promote the efficiency of the service" enjoyed an entitlement to his job. *Id.* at 192, 194 (citing among other cases *Roth,* 408 U.S. at 576–78, 92 S.Ct. at 2708–09). Similarly, in *Ashton v. Civiletti,* 613 F.2d 923 (D.C.Cir.1979), an FBI manual informed a certain class of employees, "You may assume that your position is secure, if you continue to do satisfactory work," *id.* at 929, and we found an entitlement. *Id.* Neither case seems to us to control the one at hand. Nothing in the background of either provision suggested that those creating the standard aimed at the sort of administrative flexibility that Congress sought in § 5535(a)(3)(B), and the stakes for the employee in *Johnson* and *Ashton*—dismissal—might readily make a court reluctant to infer any such flexibility. Moreover, in the context of employment *termination,* arbitrators and state courts have over time transformed the terms "for just cause" and "for good cause" into terms of art requiring an employer to affirmatively demonstrate some incompetence or inefficiency in order to fire an employee. *See* F. Elkouri & E. Elkouri, *How Arbitration Works* 651–54 (4th ed. 1985) (arbitrators' common law of "for cause" termination); T. Kheel, 10 *Labor Law* § 62.06[2] at 62–38 to 62–42 (1987) (termination "for cause" in state courts); *Id.* § 62.05[2] at 62–27 to 62–29 (state statutes limiting employment at will doctrine); H. Perritt, *Employee Dismissal Law and Practice* 152–56 (1984) (state court development of "for cause" standard).

We note, however, that even in the context of *dismissal* for non-probationary employees, standards as vague as the present one are sometimes deemed to preclude the finding of an entitlement to continued employment. In *Drake v. Scott,* 823 F.2d 239 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987), a state regulation stated, "The tenure of every permanent employee is based on satisfactory performance of duties ... [S]atisfactory performance is a condition of continued employment." *Id.* at 241. It then went on to list "causes" for which an employee was subject to discharge, suspension, or demotion. *Id.* Nevertheless, the Eighth Circuit found that under Arkansas law these provisions created no entitlement, as they lacked an express statement that dismissal would not be without cause.

The vagueness of the criteria clearly militate against the finding of an entitlement; procedural safeguards are most valuable where an outcome may turn on the resolution of specific factual issues. *See, e.g., Mathews v. Eldridge,* 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976) (focus on "risk of error inherent in the truth-finding process").

*Vesting decision and valuation in a specific party.* Such a vesting is often seen as compelling the conclusion that no property interest can be found. This has been true even in the context of dismissal itself, and even as to jobs not readily classifiable as "probationary." In *Edwards v. Brown,* 699 F.2d 1073 (11th Cir.1983), for example, a city ordinance provided that police officers "shall serve during good behavior and efficient service, to be judged by the Commissioner or a designee. They may be discharged, after trial as provided by law or regulation." *Id.* at 1075. After finding that the right to "trial" applied only where provided by other sections, and stating that the "good behavior and efficient service" formula would normally allow dismissal only "for cause," the court concluded that, as the reasons for termination were "to be judged by the Commissioner," the office was held at will. *Id.* at 1077. Similarly, in *Owen v. City of Independence,* 560 F.2d 925, 938 (8th Cir.1977), *vacated on other grounds,* 438 U.S. 902, 98

S.Ct. 3118, 57 L.Ed.2d 1145 (1978),[6] the court considered a city charter provision authorizing the city manager to "[a]ppoint, and when deemed necessary for the good of the service ... remove all directors or heads of administrative departments." Though noting that many Missouri cases construed the "good of the service" formula as equivalent to requiring "cause," the court found that the vesting of the power in the city manager turned it into an appointment at will. It relied heavily on a Missouri decision to the effect that when discretion is so vested, then the power may be exercised "whenever in the mind and judgment of the donee of the power the fact or thing exists upon which his discretion is rested." *Id.* Of course the high executive character of the post obviously militated in favor of a construction reserving the city manager's flexibility.

A number of other cases also stress the vesting of decisionmaking authority in a particular officer or office, but we put less weight on them because the character of the interest at stake bespeaks such a strong government interest in discretion. In this category are several cases involving employees with probationary status, *Dorr v. County of Butte*, 795 F.2d 875, 878 (9th Cir.1986); *Blanton v. Griel Memorial Psychiatric Hospital*, 758 F.2d 1540, 1543 (11th Cir.1985); *cf. Mazaleski v. Treusdell*, 562 F.2d 701, 709–10 n. 23 (D.C.Cir.1977) (reserve commissioned officer in Public Health Service found analogous to probationary employee), one involving a claimed entitlement to leave without pay, *Schwartz v. Federal Energy Regulatory Commission*, 578 F.2d 417, 420–21 (D.C.Cir.1978), and one involving a policeman's claim to a particular assignment, *Hughes v. Whitmer*, 714 F.2d 1407, 1414 (8th Cir.1983), *cert. denied*, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984).

*Pay increase as promotion.* A pay increase is of course a variety of promotion. As Congress recognized in the Federal Salary Reform Act of 1962, the superior's flexibility in awarding such advancement is a useful tool in eliciting high-quality performance. *See supra* at 18–19. A within-grade pay increase under § 5335(a)(3)(B) is *not* aimed at protection of federal employees against inflation; that is covered by the pay comparability provisions of 5 U.S.C. § 5305 (1982), which were added in the Federal Pay Comparability Act of 1970, Pub.L. No. 91–656, 84 Stat. 1946 (codified in scattered sections of 5 U.S.C.) (1971). Nor is it an automatic seniority-based yearly pay hike; Congress's express intent in the 1962 Federal Salary Reform Act was to replace just such a lockstep system with one based on a superior's subjective evaluation of employee performance. *See supra* at 17. Rather, within-grade increases are the only method by which superiors can grant raises for good work or withhold raises for unacceptable performance to employees in certain grades; in those grades it is to perform the function that "merit pay" increases serve in the grades to which they are applicable.

In providing for merit pay in 1978 in the CSRA, 5 U.S.C. § 5401 *et seq.* (1982),[7] Congress gave off some conflicting signals as to the status of within-grade pay increases, but it changed neither the language nor, we think, the basic goal of flexibility. Congress provided that a "merit pay system" should apply to federal employees in higher grades, unless the employing agency secured a presidential exclusion from the system. 5 U.S.C. § 5401 (1982). But no employee can be covered by both: within-grade pay increases are not available for an employee covered by merit pay. 5 U.S. C. § 5335(e); S.Rep. No. 969, 95th Cong., 2d Sess. 91–92 (1978); H.R.Rep. No. 1403,

---

**6.** On remand, the Eighth Circuit reaffirmed its holding in *Owen I* that Owen had no property interest in continued employment. *Owen v. City of Independence*, 589 F.2d 335, 337 (1978), *rev'd on other grounds*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

**7.** Congress slightly modified the merit pay system in 1984 to bring it in line with the govern-

ment-wide "Performance Management and Appraisal System." 98 Stat. 3208 (1984). *See* 5 U.S.C. § 5401 *et seq.* (1982 and Supp. IV 1986). For the purposes of determining whether the petitioner had an entitlement in 1982, however, we examine the statutory framework in place at that time.

95th Cong., 2d Sess. 11 (1978), U.S.Code Cong. & Admin.News 1978, pp. 2723, 2813, 2814. Congress did not merely add the merit pay system on top of the existing within-grade increase scheme; that might have implied a congressional determination that the latter should operate primarily or entirely without regard to employee performance. Instead it made the two systems mutually exclusive, providing in each grade a single means for superiors to advance diligent employees.

To be sure, a portion of the legislative history of the CSRA in 1978 expressed discouragement as to fulfillment of the goals pursued by the 1962 act. The Senate Report on the CSRA decried the difficulty of "rewarding excellence and discouraging lackluster performance" under the then-current system, S.Rep. No. 969, 95th Cong., 2d Sess. 11 (1978), U.S.Code Cong. & Admin.News 1978, p. 2733, and noted that "[p]ay increases are awarded almost automatically," *id.* Even assuming post-enactment legislative history could ever alter a provision's original meaning,[8] we think these phrases cannot do so in the present context, where Congress's *acts* manifested a steadfast attachment to the old purposes and simply installed a different mechanism for certain grades. We would hardly further Congress's intent if we used its discouragement about within-grade pay increases as a justification for further rigidifying the system.

Thus we find several elements supporting the classification of within-grade pay increases as promotions: Congress's 1962

intent to give agencies a great deal of flexibility to reward superior performance; its 1978 decision to leave within-grade pay increases in place as the only method of granting performance-based pay raises to lower-grade federal employees; and the existence of a completely different system for inflation adjustment.

Courts have hardly ever found an entitlement to a promotion. Most relevantly, the Ninth Circuit has found no entitlement to merit pay increases—which, as we have seen, parallel within-grade increases. *Veit v. Heckler*, 746 F.2d 508, 511 (9th Cir.1984). This is despite the statute's specification of evaluative criteria in some detail, *see* 5 U.S.C. § 5402(b) (1982), in contrast to the bare "acceptable" for within-grade. *See also Bigby v. City of Chicago*, 766 F.2d 1053, 1056–57 (7th Cir.1985) (no entitlement to promotion despite statute requiring promotions to be made "on basis of ascertained merit and seniority in service and examination"), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 793, 88 L.Ed.2d 771 (1986); *Pinar v. Dole*, 747 F.2d 899, 915 (4th Cir.1984) (letter informing an employee that "[the] promotion might be made permanent if [you meet] the requirements stated in the job description" does not give employee entitlement to continue at higher level), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985).

The one case finding an entitlement in the advancement context is *Needleman v. Bohlen*, 457 F.Supp. 942 (D.Mass.1978), *aff'd*, 602 F.2d 1 (1st Cir.1979), which rests

---

8. While "[s]ubsequent *legislation* declaring the intent of an earlier statute is entitled to great weight," *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) (emphasis added), "[a] mere statement in a [committee] report ... as to what the Committee believes an earlier statute meant is obviously less weighty." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980). *See also Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974) ("post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage"); Sands, *Sutherland Statutory Construction* § 49.11 at 415 (4th ed. 1985).

In the text we merely considered (and rejected) a possible argument that the 1978 CSRA modified the correct *interpretation* of the 1962 act. *A fortiori* we would reject any suggestion that the CSRA so altered the "legal landscape" as to justify judicial *revision* of the 1962 act. *See* G. Calabresi, *A Common Law for the Age of Statutes* (1982) (proposing judicial revision of obsolete statutes); *but see* R. Posner, *The Federal Courts: Crisis and Reform* 290–92 (1985) (critical of the Calabresi proposal's expansion of judicial power, its optimism about judicial capacity for assessing changes in legal context, and its disregard of interest-group character of some legislation); Weisberg, *The Calabresian Judicial Artist: Statutes and the New Legal Process*, 35 Stan.L.Rev. 213, 247, 256–57 (1983).

on a collective bargaining agreement providing that teachers such as the plaintiff could not be denied a pay increment unless their teaching performance were evaluated as "unsatisfactory." Neither the district nor circuit court made any effort to assess the precise extent of the agreement's foreclosure of discretion.

The agreement in *Needleman* employed the same term as Congress *supplanted* in its adoption of the 1962 Act (or, strictly speaking, its inverse, *"un* satisfactory"). We do not claim any extraordinary or self-evident divide between "satisfactory" and "acceptable," but Congress's choice of the latter term, when it strove to confer greater flexibility on agency heads, may derive from a sense that "acceptability" tends inherently to conjure up the discretion of the person "accepting" the employee's quality of performance. In any event, the *Needleman* courts' sketchy treatment of the subject disinclines us to accord their conclusion great weight.[9]

*Congressional concern for flexibility.* This concern is manifest throughout. As noted, the vague language and the specific vesting of the discretion in employees' superior officials point in that direction. So does the context—a variety of promotion. Congress's references to the private sector carry the same connotation. It was concerned to attract and hold in the civil service the sort of people who respond to incentives, who are not drawn to a rigid system indifferent to talent or effort, who are ready to take chances. This intent seems to us to militate powerfully—perhaps conclusively—against classifying within-grade pay increases as entitlements. *Cf.* Note, *Developments in the Law—Public Employment,* 97 Harv.L.Rev. 1611, 1795–1800 (1984) (emphasizing need for flexibility in public employment decisions); Frug, *Does the Constitution Prevent the Discharge of Civil Service Employees?,* 124 U.Pa.L.Rev. 942, 989–996 (1976) (same).

## IV. CONCLUSION

Congress in 5 U.S.C. § 7123 precluded review of appellant's non-constitutional claims regarding the Authority's decision. Although that language was not sufficiently precise under circuit law to cut off review of her constitutional claim, that claim fails because the congressional concern for flexibility in the awarding of within-grade pay increases is not consistent with finding a property interest in such mini-advancements. Accordingly, the district court's order granting summary judgment is affirmed.

---

**9.** In *Colm v. Vance,* 567 F.2d 1125 (D.C.Cir. 1977), we left open the issue (not briefed by either side) whether statutes authorizing promotion of foreign service employees "on the basis of merit," to be based on relative performance, might confer an entitlement to promotion.

*Id.* at 1131–32. We think that under the circumstances little can be derived from that non-decision.