43 F.3d 682
 148 L.R.R.M. (BNA) 2090, 310 U.S.App.D.C.
31, 63 USLW 2457
 UNITED STATES DEPARTMENT OF the TREASURY, UNITED STATES
CUSTOMS SERVICE, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
National Treasury Employees Union, Intervenor.
 No. 93-1388.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 12, 1994.
Decided Dec. 30, 1994.
Rehearing and Suggestion for Rehearing In Banc Denied March 1, 1995.
 
 Petition for Review of an Order of the Federal Labor Relations Authority.
 Marc P. Richman, Atty., Dept. of Justice, Washington, DC, argued the cause, for petitioner. With him on the briefs were Frank W. Hunger, Asst. Atty. Gen., and William G. Kanter, Atty., Dept. of Justice, Washington, DC.
 William E. Persina, Atty., Federal Labor Relations Authority, Washington, DC, argued the cause, for respondent. With him on the brief was David M. Smith, Sol., Federal Labor Relations Authority, Washington, DC. Arthur A. Horowitz and Pamela P. Johnson, Washington, DC, Attys., entered appearances for respondent.
 Elaine D. Kaplan, Deputy Gen. Counsel, Nat. Treasury Employees Union, Washington, DC, argued the cause, for intervenor. With her on the brief was Gregory O'Duden, Gen. Counsel, Nat. Treasury Employees Union, Washington, DC. Barbara A. Atkin, Washington, DC, Atty., entered an appearance, for intervenor.
 Before: EDWARDS, Chief Judge, and SILBERMAN and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 The government appeals the Federal Labor Relations Authority's affirmance of an arbitrator's award that held a regulation issued by the Customs Service in violation of a statute regulating coastwise trade. The Authority challenges our jurisdiction to review its order. We hold instead that the arbitrator and the FLRA exceeded their own jurisdiction.
 
 I.
 
 2
 At the time this case arose, Sec. 1448(a) of the federal customs laws required ships originating from "a foreign port or place" to make "formal entry" with United States customs officials before unloading any goods or passengers at a United States port. 19 U.S.C. Sec. 1448(a) (1988) (superseded). Formal entry entails the presentation of the ship's manifest and other documentation at the port customshouse and was required of such vessels at all U.S. ports of call. Id. Since ships often arrive when customshouses are closed and formal entry impossible, Congress also provided for "preliminary entry" to enable unloading prior to formal entry. A ship's captain could make preliminary entry "by making oath or affirmation to the truth of the statements contained in the vessel's manifest and delivering the manifest to the customs officer who boards such vessel." Id. When preliminary entry was requested, the Customs Service would arrange to have customs personnel available to meet an incoming vessel and receive the manifest, after which cargo could be unloaded to approved warehouses or container yards pending formal entry. See id. The costs of this special attention were borne by the shipper. See 19 U.S.C. Sec. 261 (1988) (repealed 1993).
 
 
 3
 In 1990, the Customs Service adopted the Coastwise Advanced Preliminary Entry (CAPE) program for its operations in the Southeastern United States. The program streamlined preliminary entry for so-called "coastwise vessels"--those ships originating from a foreign port that have already made a formal entry with U.S. customs. Technological innovations such as the capacity to transmit manifests electronically in advance of arriving vessels had made unnecessary the actual physical transfer of manifests to waiting customs officials. Accordingly, the CAPE program effectively eliminated boarding as a routine aspect of preliminary entry.
 
 
 4
 An expected consequence of the change in policy--and one highly disagreeable to the National Treasury Employees Union (NTEU), which represents the customs employees affected by the CAPE program--was a diminution in the amount of lucrative overtime work assigned to customs agents, who were no longer needed to meet arriving vessels at odd hours of the day or night. Although not required to do so, the Service offered to negotiate over "appropriate arrangements" for employees adversely affected by the new program.[1] The union rejected this proposal, however, and instead filed a grievance under the collective bargaining agreement.
 
 
 5
 Under the Federal Service Labor-Management Relations Statute (FSLMRS or Statute), 5 U.S.C. Sec. 7121 (1988), collective bargaining agreements between federal agencies and unions representing their employees must "provide procedures for the settlement of grievances." The Statute defines "grievances" to comprise any complaint concerning
 
 
 6
 (i) the effect or interpretation, or a claim of breach, of a collective bargaining agreement; or
 
 
 7
 (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment....
 
 
 8
 Id. Sec. 7103(a)(9)(C). Parties are not required to adopt a grievance procedure coextensive with the Statute's provision, see id. Sec. 7121(a)(2) (the parties' contract "may exclude any matter from the application of the grievance procedures"), but the collective bargaining agreement between the Customs Service and the NTEU defines "grievance" in language identical to that of Sec. 7103(a)(9)(C).
 
 
 9
 The union's grievance alleged that the Service's decision not to require actual boarding as a component of preliminary entry under the CAPE program violated Sec. 1448(a) as well as its primary implementing regulations. The union argued that since the customs law requires delivery of "the manifest to the customs officer who boards such vessel," 19 U.S.C. Sec. 1448(a) (emphasis added), the Customs Service could not legally dispense with boarding.
 
 
 10
 Initially, the arbitrator dismissed the union's complaint. "The statutory and regulatory provisions upon which the union relies," he decided, "do not fall within the contractual category" of grievance. Although the CAPE program could be thought to "affect conditions of employment," the arbitrator reasoned that "every law-related action of the Agency has some impact on its employees" (emphasis added), and therefore a mere effect was an "insufficient nexus" to establish an arbitrable grievance. He thought that whether a particular "law, rule, or regulation" provided a cognizable basis for grievances should be answered by drawing upon a "zone of interest" analysis--i.e., by determining whether the law was intended to benefit the employees on whose behalf the grievance was brought. Persuaded that Sec. 1448(a) was not enacted with the interests of Customs officers in mind, he concluded that the dispute was not arbitrable.
 
 
 11
 The union appealed his decision to the FLRA, which has authority to review arbitration awards under 5 U.S.C. Sec. 7122.[2] The Authority determined that the arbitrator had too narrowly construed the term "grievance" as used in the Statute. United States Dep't of Treasury, United States Customs Serv. v. NTEU (Customs I ), 43 F.L.R.A. No. 72, at 4-5 (1992). The Authority reasoned that "law" as used in Sec. 7103(a)(9)(C)(ii) had the same scope as the term "applicable law" under Sec. 7106(a), the section of the Statute that sets forth the management prerogatives of covered federal agencies.[3] Id. at 4. Under that latter section, an agency acting "in accordance with applicable laws" is guaranteed authority, notwithstanding any provision of the FSLMRS, to make all major personnel decisions. Since the Authority had previously interpreted "applicable law" to "include[ ] provisions of the U.S.Code, the U.S. Constitution, controlling judicial decisions, and Presidential Executive Orders," so long as they "relate to the conditions of employment of unit employees," National Treasury Employees Union & U.S. Dep't of Treasury, Bureau of Pub. Debt, 42 F.L.R.A. 1333, 1337, 1338 (1991) (Bureau Pub. Debt ), it read "law" under Sec. 7103(a)(9)(C)(ii) to have the same broad meaning. Nor was the term limited to "statutes that prescribe employee rights and benefits." Customs I, 43 F.L.R.A. No. 72, at 4 (quoting Bureau Pub. Debt, 42 F.L.R.A. at 1338). In short, there are no definitional constraints on the available grounds for grievances under Sec. 7103(a)(9)(C)(ii) other than that the law in question "affect" conditions of employment in some way in a particular circumstance.
 
 
 12
 The Authority remanded the case to the arbitrator, and, after being so instructed concerning the Statute's meaning, he determined that since the collective bargaining agreement defined a grievance in the same terms as did the Statute, the union had put forward an arbitrable dispute by alleging a violation of Sec. 1448(a). On the merits, the arbitrator held that the CAPE program was inconsistent with Sec. 1448(a) (and the Customs Service's own regulations) by virtue of having dispensed with boarding as an element of preliminary entry. To redress the violation, the arbitrator awarded back pay to the relevant customs officials in the amount that they would have earned but for the CAPE program; he also ordered the Customs Service "to comply with all applicable laws, rules and regulations in the future."[4]
 
 
 13
 This time the Service appealed to the FLRA, arguing that Sec. 1448(a) was not grievable under the FSLMRS and, alternatively, that the CAPE program did not violate that section of the customs laws. Without any deference to the Customs Service's interpretation of a law that Congress entrusted to the Service to enforce, compare Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (federal appellate courts owe deference to agencies' interpretations of the statutes they are charged with administering when the statutes are silent or ambiguous with respect to the issues in question), the FLRA held that Sec. 1448(a) plainly contemplated physical boarding as an aspect of preliminary entry. The Authority also dismissed the Service's argument that the arbitrator's award transgressed its management prerogatives under Sec. 7106(a) of the Statute. United States Dep't of Treasury, United States Customs Serv. v. NTEU, 46 F.L.R.A. No. 137, 1439, 1443 (1993).
 
 
 14
 The Customs Service's request for rehearing was denied; it then petitioned for review of the Authority's decision. Congress has since amended Sec. 1448(a) so as expressly to provide for preliminary entry through electronic communication. See Pub.L. No. 103-182, Title VI, Sec. 656, 107 Stat. 2211 (1993). Consequently, only the back pay portion of the arbitrator's award remains in the case.
 
 II.
 
 15
 We are faced, then, with the FLRA's construction of a statute drafted by Congress to govern an aspect of foreign trade, the importation of ships' cargo into the United States. The petitioner presents us with a volley of arguments to support its claim that the Authority improperly compelled the arbitrator, against his better judgment, to interpret a law never meant to regulate labor relations or the assignment of work to employees--and then itself interpreted the law wrongly. The Authority's primary defense is jurisdictional. Neither we nor any court, it is argued, has the power to review the FLRA's decision no matter what "law" the arbitrator and the Authority applied in the case.
 
 
 16
 The Authority's argument concerning our lack of subject matter jurisdiction is based on the express preclusion of judicial review set forth in Sec. 7123(a) of the Statute:
 
 
 17
 Any person aggrieved by any final order of the Authority other than an order under--
 
 
 18
 (1) section 7122 of this title (involving an award by an arbitrator), unless the order involves an unfair labor practice ...
 
 
 19
 * * * * * *
 
 
 20
 may ... institute an action for judicial review of the Authority's order....
 
 
 21
 5 U.S.C. Sec. 7123(a) (emphasis added).
 
 
 22
 We have recognized that the merits of an arbitrator's award that implicates only the collective bargaining agreement are, by virtue of the categorical nature of this provision, absolutely immune from judicial review. United States Dep't of Justice v. FLRA, 981 F.2d 1339, 1342 (D.C.Cir.1993). The Authority's role in reviewing such awards, by contrast, depends on the nature of the exception raised by the complaining party. If the arbitrator's decision is attacked "because it is contrary to any law, rule, or regulation," the Authority reviews the legal question de novo. 5 U.S.C. Sec. 7122(a)(1). If, on the other hand, the objection is not one of law, but of contract, the Authority's role is limited to that of "federal courts in private sector labor-management relations." Id. Sec. 7122(a)(2). See also United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) (district court must enforce arbitration award if it "draws its essence" from the parties' agreement). In either event the Authority is the final stop "unless the order involves an unfair labor practice." This case does not. We are told, however, that the union has filed an unfair labor practice charge against the Service for its refusal to comply with the arbitrator's award. Once the Authority determines--as it would be expected to do in light of its opinion affirming the award--that the Service committed an unfair labor practice by refusing to comply with the award, the Service could petition for review of that order. The Customs Service suggests that at that point we might have jurisdiction to review the arbitrator's award even if we lack it now. In light of that prospect, it moved after oral argument to hold the case in abeyance until the conclusion of the unfair labor practice proceedings.
 
 
 23
 The Authority contends, however, that to read Sec. 7123(a) of the Statute to permit judicial review of an arbitrator's award when the FLRA seeks to enforce it would be to circumvent, indeed nullify, Congress' deliberate preclusion of judicial review of arbitrators' awards. Its position has been endorsed by the Ninth Circuit in United States Marshals Serv. v. FLRA, 778 F.2d 1432, 1435-36 (9th Cir.1985), and the Second Circuit in United States Dep't of Justice v. FLRA, 792 F.2d 25, 27-28 (2d Cir.1986), and we too agree with the Authority. It does not appear that either a federal agency or a public-sector union has any means to enforce an arbitrator's award other than to file an unfair labor practice charge. See Columbia Power Trades Council v. United States Dep't of Energy, 671 F.2d 325, 329 (9th Cir.1982) (refusing on these grounds to issue a writ of mandamus ordering compliance with arbitration award). In light of our holding that the district courts lack jurisdiction to review arbitration awards arising under the FSLMRS, see Griffith v. FLRA, 842 F.2d 487, 491 (D.C.Cir.1988), it is doubtful that district courts have jurisdiction to enforce such awards--as they do in the private sector, where limited review is available. And surely it would have been senseless for Congress to preclude judicial review of arbitration awards except when they are sought to be enforced by the only means available. Limiting judicial review under those conditions would be of no significance since an unenforceable award is a nullity, which no one would need or want to be reviewed.
 
 
 24
 We must bear in mind, moreover, that the typical arbitrator's award interprets a collective bargaining agreement, and if at the enforcement stage we gained jurisdiction to review the FLRA's affirmance of the award, we would be obliged to review even rather minor applications of such agreements--a result Congress clearly wished to avoid. See Department of Justice, 981 F.2d at 1342; Griffith, 842 F.2d at 491.
 
 
 25
 Of course, the phrase "involves an unfair labor practice" in Sec. 7123(a) must have some meaning. We think Congress contemplated and was concerned about the sort of case that arises quite often in the private sector when an arbitrator's award is based in part on the unfair labor practice provisions of the National Labor Relations Act. See, e.g., Utility Workers Union v. NLRB, 39 F.3d 1210, 1216 (D.C.Cir.1994) (arbitrator's decision may be deferred to in resolving unfair labor practice). In such a case, the FLRA's interpretation of the Act advanced in the process of reviewing the arbitrator's award would be subject to judicial review.[5]
 
 
 26
 Concluding, as we do, that our jurisdiction would not be enhanced if this dispute were to come to us as an agency petition for review of an unfair labor practice determination, we are obliged to consider carefully whether we have jurisdiction now because, if not now it would be, as the Authority argues, never. The Customs Service relies primarily on two rather unpersuasive arguments to establish our subject matter jurisdiction. The first is that the broad management rights section of the Statute, Sec. 7106(a), which states that "nothing in this chapter shall affect the authority of any management official of any agency" to determine the agency's mission, somehow overrides the jurisdictional bar if judicial review is necessary to ensure the Service's right to determine its mission (i.e., if the FLRA has decided a case against the government). That would mean that if both a federal agency and a union were dissatisfied with an FLRA opinion upholding an arbitrator's interpretation of a statute, we would have jurisdiction over only the issues presented in the agency's petition. That seems to us to be a labored, even silly, construction of the statute. There is not the slightest indication that Congress intended such an asymmetrical construction of its limitation on judicial review--or, indeed, that the substantive provision of the management rights clause would have any applicability to the provision precluding judicial review. According to the Service's arguments, whether we had jurisdiction would depend on whether the FLRA's adverse decision trammelled core management rights. We would only have jurisdiction if we had already concluded that the dispute had to be resolved in management's favor.
 
 
 27
 Also wide of the mark is the Service's reliance on Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), to circumvent the statutory preclusion. Leedom stands for the proposition that if an agency openly violates a clear mandate of a statute even a preclusion of judicial review (in that case implied) will not bar judicial intervention. See id. at 188-91, 79 S.Ct. at 183-85. There is no such clear transgression of a substantive statutory mandate here.[6]
 
 
 28
 The key question presented, as we see the case, is the proper scope of Sec. 7123(a)'s express preclusion of judicial review. Can it be that the FLRA's interpretation of any "law"--including the Constitution, judicial decisions, or any statute--is immune from judicial review? (On the Authority's understanding, it is not even open to us to ask whether a particular law has any effect whatsoever on employment conditions; once the Authority is satisfied that a law falls within the limitation imposed by Sec. 7103(a)(9)(C)(ii) ("any law, rule, or regulation affecting conditions of employment ") (emphasis added), its determination to that effect would foreclose our review.) In answering this question--as the government maintains and the Authority does not dispute--we owe no deference to the Authority's interpretation of any statutory language that bears on our jurisdiction. See, e.g., Ramey v. Bowsher, 9 F.3d 133, 136 n. 7 (D.C.Cir.1993); Chrysler Corp. v. EPA, 600 F.2d 904, 913 (D.C.Cir.1979).
 
 
 29
 Although the Authority did not, either in its brief or at oral argument, acknowledge the point, we have already rejected the Authority's position--at least as it relates to collateral constitutional claims. In Griffith, we observed that the "maxim that congressional preclusion of judicial review must be 'clear and convincing' applies in a particularly rigorous fashion ... when constitutional claims are at stake," 842 F.2d at 494, and went on to hold that Congress had not expressed itself in such a fashion in the FSLMRS. We thought it clear that Congress expected the FLRA's review of arbitrators' awards to track closely the federal courts' limited review of arbitrators' awards in the private sector. Id. at 491. In the private sector an arbitrator interpreting a collective bargaining agreement would not be expected to apply constitutional law.[7]
 
 
 30
 Of course, an arbitrator in the private sector would not be expected to apply a federal statute either.[8] The private sector arbitrator must confine himself to interpreting the agreement; so long as he does his award is virtually unreviewable. See Enterprise Wheel & Car, 363 U.S. at 596-97, 80 S.Ct. at 1360-61. By contrast, under the Federal Service Labor-Management Relations Statute arbitrators are given direct authority to interpret "any law, rule, or regulation affecting conditions of employment" unless the parties' collective bargaining agreement specifically limits the scope of grievances. 5 U.S.C. Sec. 7121(a)(2). And in Griffith, which in part involved the FLRA's modification of an arbitrator's award based on a different interpretation of the Back Pay Act, we concluded that any further judicial review of the statutory claim was barred. 842 F.2d at 494. That case, however, concerned the interstices of a federal statute that undisputedly was designed to deal directly with employee working conditions. Id. at 494 ("[T]he legal error, if any, is at most one of failing to capture some marginal nuance of the Back Pay Act."). Here we are confronted with an arbitrator's interpretation of a statute governing international trade which could hardly be thought to have been crafted with any regard for Customs Service employees.
 
 
 31
 It seems clear to us that Sec. 7123(a) (the preclusion of judicial review of arbitrated disputes) must be read in light of Sec. 7103(a) (the definition of permissible grounds for grievances). Congress obviously assumed in drafting the former provision that an arbitrator would never have occasion to interpret a law that did not affect working conditions. The term "affecting working conditions," in turn, must have been thought to impose a real limitation on an arbitrator's authority. The FLRA's construction of that phrase would, however, deprive it of any limiting principle. Absolutely any law could under some circumstances have some adverse consequences on the working conditions of one or more employees. The Authority's definition thus does not restrict the category of laws that may be brought to arbitration, but only suggests that a law may be the subject of a grievance if an employee is somehow aggrieved by its application--which in essence reduces the limitation to a standing requirement. We think, rather, that a "law, rule, or regulation affecting conditions of employment" can be only interpreted, as it initially was by the arbitrator in this case, to confine grievances to alleged violations of a statute or regulation that can be said to have been issued for the very purpose of affecting the working conditions of employees--not one that merely incidentally does so. Once the Sec. 7103(a) language is given that meaning it becomes apparent that a "grievance" predicated on a claim of violation of a law that is not directed toward employee working conditions is outside both the arbitrator's and the FLRA's jurisdiction.[9]
 
 
 32
 The very preclusion of judicial review suggests powerfully that Congress could not have contemplated, let alone intended, that all or any part of American law would be definitively interpreted by the FLRA on review of one or a series of cases originally put to arbitration. To give any administrative tribunal such final authority to construe any or all statutes or treaties of the United States would be a staggering delegation, which surely would have provoked considerable congressional debate. That Congress would entrust such sweeping authority to a minor three-member commission with quite restricted expertise is, when one ponders the matter, utterly inconceivable.[10]
 
 
 33
 The Authority was led into its farfetched, if self-serving, misconstruction of Sec. 7103(a)(9)(C)(ii) (the definition of grievance) by effectively equating the phrase "law, rule, or regulation affecting conditions of employment" with the term "applicable laws" in the management rights section. The latter provision, as we have noted, ensures that an agency acting in "accordance with applicable laws" may make virtually all the most important decisions respecting personnel matters without regard to any provision of the entire FSLMRS. As such, the term "applicable law" might well include laws that compel certain personnel actions but which are by no means directed to working conditions. Therefore, an "applicable law" could easily have a much broader subject matter scope than a "law, rule, or regulation affecting working conditions." Indeed, the Supreme Court has already rejected the Authority's equation of "applicable law" in Sec. 7106(a)(2) with "law, rule, or regulation" in Sec. 7103(a)(9)(C)(ii) in Department of Treasury, IRS v. FLRA, 494 U.S. 922, 931-32, 110 S.Ct. 1623, 1628-29, 108 L.Ed.2d 914 (1990). To be sure, in that case the Court was faced with the reverse argument. The FLRA had maintained that any "law, rule, or regulation affecting conditions of employment" was an "applicable law," and therefore could be relied upon to require management to negotiate matters touching upon its exclusive prerogatives under Sec. 7106(a). The Court rejected that claim on the obvious ground that whereas the former phrase included rules and regulations, the latter did not.[11] The Authority argues, however, that although the content of "applicable laws" may well be narrower than that of law, rule, or regulation affecting employment, all components of the former phrase fit within the latter. We disagree. A government agency, for example, might well assert that the Constitution itself dictated the manner in which it "hired or laid off" employees, and, as in this case, the assignment of work will almost always to some extent reflect the agency's efforts to give effect to the statutes Congress has charged it with administering--statutes not directed to employee working conditions. This is not to say that the FLRA does not have authority to reject an agency's interpretation of a law applicable to certain personnel actions covered under Sec. 7106(a). But--and it is a big but--a dispute between an agency and the FLRA concerning an interpretation of a law applicable to the exercise of management prerogatives will almost always arise in a negotiability case or unfair labor practice proceedings, and, following the statutory design for such questions, may ultimately be brought to a federal court of appeals. Accordingly, there was no reason for Congress to limit "applicable laws" in Sec. 7106 as it did "law, rule, or regulation" in Sec. 7103(a)(9)(C)(ii) to those that affect (are directed to) working conditions.
 
 
 34
 In sum, we conclude that the arbitrator essentially got it right the first time. A grievance claiming a "violation, misinterpretation, or misapplication of a law, rule, or regulation" may be brought under Sec. 7103(a)(9)(C)(ii) (assuming the relevant agreement tracks the statutory definition) if the particular legal authority relied upon was fashioned for the purpose of regulating the working conditions of employees. Our review is available for the limited purpose of determining whether the Authority exceeds its jurisdiction. Having determined that it did so here, we grant the petition for review.
 
 
 
 [1]
 In United States Customs Serv. v. FLRA, 854 F.2d 1414 (D.C.Cir.1988), we decided that the Customs Service could not be required to negotiate over implementation of an "experimental" preliminary entry program along roughly similar lines for its Pacific Region operations. We held that the NTEU's counter-proposal would "directly interfere" with the Service's "reserved authority" and therefore was not subject to required bargaining. Id. at 1418-20
 
 
 [2]
 Section 7122(a) provides:
 Either party to arbitration under this chapter may file with the Authority an exception to any arbitrator's award pursuant to the arbitration.... If upon review the Authority finds that the award is deficient--
 (1) because it is contrary to any law, rule, or regulation; or
 (2) on other grounds similar to those applied by federal courts in private sector labor-management relations;
 the Authority may take such action and make such recommendations concerning the award as it considers necessary, consistent with applicable laws, rules, and regulations.
 
 
 [3]
 Section 7106 is captioned "Management Rights." In relevant part, subsection (a) states:
 [N]othing in this chapter shall affect the authority of any management official of any agency--
 (1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency; and
 (2) in accordance with applicable laws--
 (A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;
 (B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;
 (C) with respect to filling positions, to make selections for appointments from--
 (i) among properly ranked and certified candidates for promotion; or
 (ii) any other appropriate source; and
 (D) to take whatever actions may be necessary to carry out the agency mission during emergencies.
 5 U.S.C. Sec. 7106(a).
 
 
 [4]
 Although the overtime pay that the customs officers would have received but for the CAPE program would have been charged to the shippers, see 19 U.S.C. Sec. 261, the Customs Service was saddled with paying the back pay damages
 
 
 [5]
 For an FLRA review of an arbitration award to be deemed to "involve" an unfair labor practice within the meaning of Sec. 7122(a)(2)--and therefore to be reviewable under Sec. 7123(a)(1)--"a statutory unfair labor practice must be either an explicit ground for, or be necessarily implicated by, the Authority's decision." United States Dep't of Interior v. FLRA, 26 F.3d 179, 183 (D.C.Cir.1994) (quoting Overseas Educ. Ass'n v. FLRA, 824 F.2d 61, 67-68 (D.C.Cir.1987))
 
 
 [6]
 The Leedom exception is premised on the original federal subject matter jurisdiction of the district courts. See 358 U.S. at 188-90, 79 S.Ct. at 183-84 (citing Switchmen's Union v. National Mediation Bd., 320 U.S. 297, 300, 64 S.Ct. 95, 97, 88 L.Ed. 61 (1943)). Even if Leedom did apply to the FLRA's actions, it would therefore not confer jurisdiction upon us to hear this case. The Leedom exception obtains in those cases where direct appellate review--what the Service seeks here--is presumptively foreclosed. See id. at 187, 79 S.Ct. at 183; cf. Oestereich v. Selective Serv. Sys. Local Bd. No. 11, 393 U.S. 233, 237, 89 S.Ct. 414, 416, 21 L.Ed.2d 402 (1968)
 
 
 [7]
 In Griffith, an employee complained that the agency had failed to follow appropriate procedures in denying her a pay raise; an arbitrator ruled in her favor, but was reversed by the FLRA. She brought suit in district court in part claiming that the manner in which the FLRA disposed of her case (by not remanding to the arbitrator) violated her right to due process. See 842 F.2d at 490
 
 
 [8]
 An arbitrator is often confronted with contract language that mirrors a statute, but in that event the arbitrator's interpretation would not be described as "applying" the federal law
 
 
 [9]
 If the FLRA were to uphold an arbitrator's determination that an agency action had violated the Constitution, review would lie in this court for the purpose of determining whether the FLRA had exceeded its jurisdiction. On the other hand, a claim that the arbitration or FLRA procedures were unconstitutional would have to be brought as a collateral challenge in the district court, as was the case in Griffith. See 842 F.2d at 494-95; see also McNary v. Hatian Refugee Ctr., Inc., 498 U.S. 479, 491, 111 S.Ct. 888, 895, 112 L.Ed.2d 1005 (1991); Reno v. Catholic Social Servs., Inc., --- U.S. ----, ----, 113 S.Ct. 2485, 2499, 125 L.Ed.2d 38 (1993). The appellate and district courts, then, each have distinct, limited, and exclusive jurisdiction based on the nature of the claim. See Ayuda, Inc. v. Thornburgh, 948 F.2d 742, 753 (D.C.Cir.1991); Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 77-79 (D.C.Cir.1984)
 
 
 [10]
 Major administrative boards and commissions (such as, for example, the Federal Communication Commission, the Federal Trade Commission, the National Labor Relations Board, the Securities and Exchange Commission) usually have at least five members at the rank of executive level 4 and a chairman at level 3. See 5 U.S.C. Secs. 5314, 5315 (1988). The Authority's two members are level 5 officials and its chairman is at level 4. See id. Secs. 5315, 5316
 
 
 [11]
 Although the IRS case, like the case at bar, involved an FLRA effort to give an expansive meaning to the phrase "law, rule, or regulation affecting conditions of employment," the Court did not consider the scope of the limitation "affecting conditions of employment" because it held that the management rights section foreclosed the Authority's determination that the union's proposed grievance procedure was negotiable. See 494 U.S. at 928-32, 110 S.Ct. at 1627-29